UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **BENITAGO INC.,** *et al.,* | **Case No. 23-11394 (SHL)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

### DECLARATION OF SANTIAGO NESTARES LAMPO PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS

I, Santiago Nestares Lampo, being duly sworn, hereby depose and state as follows:

1. I am the CEO and Co-Founder of Benitago Inc. ("Parent"), the direct parent company and owner, directly or indirectly, of 100% of the equity interests in the other debtors and debtors in possession (together with Parent, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I am also a member of the board of directors of the Parent (the "Board").

2. I attended Dartmouth College from 2015 until 2017 and was working towards a bachelor's degree in computer science and economics.

3. I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"): (a) in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); and (b) to

---

[1] The last four digits of Benitago Inc.'s tax identification number are 4084. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/benitago. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1 Liberty Street, Ste. 320, New York, New York 10006.

explain to the United States Bankruptcy Court for the Southern District of New York
(the "Court") and other interested parties the circumstances that led the Debtors to seek
relief under chapter 11.

4.      Except as otherwise indicated, the facts set forth in this Declaration
are based upon my personal knowledge of the Debtors' business operations, my review
of relevant documents, information provided to me, and/or my opinion based upon my
experience, knowledge, and information concerning the Debtors.  Unless otherwise
indicated, the financial information contained in this Declaration is unaudited and
subject to change.

5.      I am authorized to submit this Declaration on behalf of the Debtors,
and, if called upon to testify, I could and would testify competently to the facts set forth
herein.

6.      This Declaration is divided into three parts.  Part I of this
Declaration provides an overview of the Debtors' business and operations, including
their corporate and capital structure.  Part II describes the circumstances that led to the
commencement of these Chapter 11 Cases and the Debtors' restructuring plans.  Part III
provides the information required by Local Bankruptcy Rule 1007-2.

I.      **THE DEBTORS' BUSINESS AND OPERATIONS**

A.      <u>**The Chapter 11 Filing**</u>

7.      On August 30, 2023 (the "Petition Date"), Benitago Inc.
(the "Parent") and each of the other Debtors filed voluntary petitions for relief under
chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their
businesses as debtors in possession pursuant to sections 1107 and 1108 of the
Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11
Cases.

8.　　To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Pleadings").[2]  I submit this Declaration to assist the Court and parties in interest in understanding the circumstances behind, and the Debtors' intended purposes for, these Chapter 11 Cases.

### B.　　Overview of the Debtors' Business, Operations, and Capital Structure

### (1)　　The Debtors' Business

9.　　My co-founder, Benedict Dohmen, and I launched our e-commerce business in 2015 while still students at Dartmouth.  Our first e-commerce brand was a posture-support product called Supportiback that we designed in our dorm room to address our own issues with back pain.  When we decided to sell our first brand on Amazon we applied a computer science mindset to increasing the products presence on Amazon.  We quickly realized that the lessons we learned from listing that first product on Amazon were scalable across a variety of products.  From that first brand developed in our dorm at Dartmouth, the Debtors have grown into a large e-commerce brand incubator and aggregator selling nearly 1,000 products across dozens of brands covering a wide range of products including lifestyle and home goods, beauty, nutrition, sports and fitness, maternity, juvenile and baby, orthopedic, pet supply and electronic goods.

10.　　The Debtors' business model is premised on creating or acquiring brands hyper-optimized for sustainable growth on Amazon.  This is accomplished by creating proprietary calculations that identify search trends and consumer sentiment

---

[2]　Substantially contemporaneously herewith, the Debtors have filed the Declaration of Thomas Studebaker, the Debtors' Chief Restructuring Officer in support of the Chapter 11 Petitions and First Day Pleadings.

data to identify product categories projected to see heightened demand from online sellers. Once product categories are identified, the Debtors determine whether they would be able to better satisfy consumer demands through building brands and products in-house (such organically developed brands, "Organic Brands") or by acquiring existing brands developed by third parties ("Inorganic Brands") that already have a presence in certain markets but that the Debtors can further optimize in additional markets.

11.     During the first few years of business, the Debtors grew steadily maturing into an approximately $20 million run-rate revenue company by March 2021. The Debtors' business experienced rapid growth during the early years and particularly during the early stages of the COVID-19 pandemic. The Debtors' growth, as well as the growth of other companies in the brand aggregator space, attracted the interest of both debt and equity investors. With the potential for growth using the investment pouring into e-commerce during the early, lock-down stages of the pandemic, certain of the Debtors took on significant debt to fund the acquisitions of Inorganic Brands.

12.     However, as consumer preferences shifted during the later stages of the pandemic as lock-downs ended, the Debtors experienced a rapid and dramatic reversal of fortune due to macroeconomic forces as the e-commerce sector has shrunk dramatically in the past two years and has continued to decline. The Inorganic Brands acquired during the height of the pandemic using the proceeds of the CoVenture Loan Agreement (as defined below) in particular have failed to perform at a level consistent with the valuations they were purchased at, which were premised on early pandemic growth trends.

13.     As explained in greater detail below, the Debtors have filed these Chapter 11 Cases to right size their capital structure to reflect this new market reality

and set the Debtors up for steady and sustainable growth going forward in-line with the current market.

(2)     The Debtors' Operations

14.     All the Debtors' brands are sold on the Amazon platform and are specifically designed for compatibility with and scaling through Amazon down to the way the product fits in standard Amazon boxes.[3]  The Debtors' brands are marketed and sold through fulfillment by Amazon or "FBA".  FBA is a service that allows businesses to outsource order fulfilment to Amazon.  The FBA business sends products to Amazon fulfillment centers and when a customer makes a purchase Amazon picks, packs, and ships the order (fulfilling it).  Amazon can also provide some of the customer service and process returns of such orders.  Once inventory is placed with Amazon by the Parent, Amazon fulfills orders from its warehouse to the customer's doorstep through the FBA service.  Amazon periodically distributes the proceeds of Amazon sales to the applicable Debtors, net of expenses charged by Amazon in connection with using the FBA service, such as warehousing and shipping costs, among others.

15.     Parent owns the intellectual property ("IP"), related Amazon merchant accounts, and inventory related to the Organic Brands sold in the U.S. and, through its ownership interest in Non-Debtor Affiliate Benitago Ltd., owns the IP, related Amazon merchant accounts, and inventory related to the Organic Brands sold in the U.K. and the EU.  Parent also owns substantially all of the inventory related to the Inorganic Brands other than a portion of inventory that the Parent contributed to the

---

[3]    Prior to the Petition Date, the Debtors were in discussions with retailers regarding the potential sale of the Debtors' products through traditional brick-and-mortar stores and/or third-party websites other than Amazon.

Acrux Subsidiaries (as defined below) to obtain additional liquidity under the CoVenture Loan Agreement (as defined below).[4]  The Debtors sell all inventory on a "first in first out" or "FIFO" basis.  As a result, over time, the inventory contributed to the Acrux Subsidiaries has been mostly reduced, and the remaining inventory at the Acrux Subsidiaries, while it will be the first items to be sold in the event of sales, represents some of the Debtors' oldest and slowest selling inventory.

16.    Parent's wholly-owned subsidiary Acrux LLC ("Acrux") owns the IP and related Amazon merchant accounts with respect to the Inorganic Brands through its wholly-owned subsidiaries (the "Acrux Subsidiaries").[5]  Acrux and the Acrux Subsidiaries collectively own the IP related to 15 brands and sell more than 300 products consisting of, among other things, health supplements, office products, beauty products, health and household products, kitchen and dining products, art products, and baby products.  Other than the contributed inventory described above, Acrux and the Acrux Subsidiaries do not own any inventory, and the vast majority of the inventory associated with its sales is produced, provided, and owned by the Parent.

17.    In addition to owning certain Organic Brands, Parent undertakes and provides all services, including administrative, operational, corporate, management, and related services, for the entire portfolio of brands (both Organic and Inorganic), including for the brands owned by the Acrux Subsidiaries.  Thus, although the Debtors operate as an integrated enterprise, Parent is responsible for all of the

---

[4]    In 2022, the Parent contributed approximately $9 million in inventory to Acrux and the Acrux Subsidiaries to fund advances under the CoVenture Loan Agreement that were used to finance acquisitions of additional Inorganic Brands.

[5]    The Acrux Subsidiaries also own certain assets from the Contributed Parties (as defined below) relating to certain Organic Brands that were transferred by the Parent to the Acrux Subsidiaries in connection with forbearance discussions with CoVenture.

expenses—and assumes all of the risks—related to maintaining both the Organic and Inorganic Brands.  For example, Parent is responsible for all of the purchasing and placement of inventory with Amazon for both the Organic and Inorganic Brands. Similarly, all employees and independent contractors, including those responsible for marketing and managing the supply chain infrastructure from production overseas in China to the applicable Amazon or third-party warehouse until it is sold, are situated at the Parent, and Parent is responsible for all associated costs, including payroll, wages and benefits, among others.

18.     Historically, substantially all sales proceeds received by the Acrux Subsidiaries (net of certain amounts payable to Amazon through FBA) were transferred to the Parent.  At the end of each month, the Debtors reviewed the amount of inventory sold by the Acrux Subsidiaries and then effectively "charged" the applicable Acrux Subsidiary by transferring funds upstream to the Parent as repayment of such inventory, at cost.  The balance of the funds transferred to the Parent (after accounting for the cost of inventory actually sold) was recorded as dividend income received by the Parent on account of its ownership interest in Acrux and the Acrux Subsidiaries. However, in July 2023, after the Special Manager (as defined below) for Acrux and the Acrux Subsidiaries was appointed, the Debtors ceased distributing money from Acrux and the Acrux Subsidiaries to Parent pending an agreement with the Special Manager for the continued provision of inventory and services.

19.     Following the appointment of the Special Manager, on August 23, 2023, Parent entered into an Interim Sales and Services Agreement (the "Intercompany Agreement") memorializing the Parent's provision of all administrative, operational, corporate, management, and related services for Acrux as well as the production and provision of inventory related to the Acrux and Acrux Subsidiary brands.  Pursuant to

7

the Intercompany Agreement, the Parent has committed to continue to provide Acrux

and the Acrux Subsidiaries with inventory and services related to the brands owned by

Acrux at cost.[6]  While historically the Debtors did not allocate expenses between Parent,

on the one hand, and Acrux and the Acrux Subsidiaries, on the other hand, in July 2023,

the Debtors obtained as part of the July Forbearance Agreement (as defined below) with

CoVenture, an allocation analysis and report from Portage Point that provided for the

allocation of inventory and services on a cost basis for the period of January 2023

through June 2023.  That allocation report forms the basis for assessing the amounts the

Parent invoices Acrux and the Acrux Subsidiaries, with the Special Manager's approval,

for the inventory and services that Parent provides to Acrux and the Acrux

Subsidiaries.

$\qquad$ (3)   <u>The Debtors' Corporate Structure</u>[7]

$\qquad$ 20.   A corporate organization chart is attached hereto as **Exhibit A**.

$\qquad$ 21.   Parent is a privately-held Delaware corporation that is majority

owned by the Co-Founders—myself and Benedict Dohmen.  Parent owns 100% of the

equity interests in Acrux, a Delaware limited liability company, and is its sole member.[8]

Acrux, in turn, holds 100% of the equity interests in (a) Aludra Ltd. ("<u>Aludra</u>"), a

United Kingdom company, and (b) each of the remaining 28 Debtors, which comprise

---

[6]   Parent believes that providing such inventory and services at cost does not adequately compensate the Parent for all of the costs and risks incurred by Parent in connection with providing such inventory and services.  For example, when Parent sells inventory at cost to Acrux and the Acrux Subsidiaries, repayment of cost of goods sold absent a markup does not appropriately compensate Parent for the costs and risks that inventory does not sell, must be sold at a discount, or is discarded entirely under various circumstances.  As such, Parent reserves the right to assert claims against Acrux and the Acrux Subsidiaries for the fair market value of such inventory and services.

[7]   Benitago LLC was formed on April 11, 2016.  Pursuant to a plan of conversion, dated January 15, 2021, Benitago LLC converted into a Delaware corporation, Benitago Inc.

[8]   Additional detail on minority shareholders and preferred shareholders can be found on the Local Bankruptcy Rule 1007-2(a)(7) disclosure found at **Exhibit F** attached hereto.

the Acrux Subsidiaries.  All of the Acrux Subsidiaries own Inorganic Brands acquired using the proceeds of the CoVenture Loan Agreement and Parent owns the Organic Brands other than with respect to the Contributed Parties (as defined below), which are held by the Acrux Subsidiaries.

22.     My Co-Founder and I also make up Parent's two-person Board of directors.  Historically, Parent served as the sole "manager" for Acrux.  However, in July 2023 and with the consent of CoVenture (as defined below), Vikram Jindal was engaged as the "special manager" for Acrux with sole and exclusive authority with respect to certain bankruptcy and restructuring transactions or transactions involving a conflict between Parent and Acrux (the "Special Manager").[9]

23.     In addition to its common stock, Parent has outstanding shares of preferred stock (collectively, the "Preferred Stock"), which were issued at various times to investors, namely:  (a) 5,269 shares of Series Seed Preferred ("PS") stock issued on April 9, 2021 and October 18, 2021;  (b) 2,768 shares of Series A Preferred ("PA") stock issued on May 5 2022;  and (c) 1,267 shares of Series A-1 Preferred ("PA1") stock issued on May 5, 2022.  Each of the Preferred Stock has a 1:1 conversion ratio for conversion to common stock and a 1x multiple liquidation preference.  Crossbeam Venture Partners FinTech Fund I, LP and Orellana Holdings, LLC (together, "Crossbeam") are the two most significant holders of Preferred Stock—together, Crossbeam holds approximately 28%, 59%, and 86% of the outstanding shares of the PS Stock, PA Stock, and PA1 Stock, respectively.[10]

---

[9]     Mr. Jindal also serves as the special manager for all of the Acrux Subsidiaries other than Aludra, where he is a director and sole member of the restructuring committee of the board with the same powers with respect to Aludra as the other Acrux Subsidiaries.

[10]    A principal of CrossBeam has been publicly summarized as describing CrossBeam "as a joint venture between CoVenture, Moelis Asset Management and Fenway Summer, with CoVenture offering

(4)      The Debtors' Capital Structure

(i)      *Assets*

24.      As of the Petition Date, the Debtors have approximately $7.5 million in cash on hand at various bank accounts.  The majority of the Debtors' cash was held in Parent's money market account (approximately $5 million).

25.      The Debtors currently have approximately $17 million in inventory, of which more than $16 million is owned by the Parent and less than $1 million is owned by certain of the Acrux Subsidiaries.  Of these amounts, approximately $9 million relates to the Organic Brands and $8 million relates to the Inorganic Brands.  Most of the inventory is held at the applicable Amazon FBA facility or a third-party warehouse.[11]  The Parent effectively transfers the inventory (on consignment) to Amazon FBA where it is sold by the applicable subsidiary / brand.  Periodically, the Debtors reconcile the sales against the inventory that was transferred.

26.      Pursuant to the sale of inventory and goods through Amazon, the Debtors' and the Non-Debtor Affiliate's average revenue for 2022 was approximately $6.3 million (or approximately $5.4 million excluding the Non-Debtor Affiliate) and the Debtors' and Non-Debtor Affiliates' average revenue for the first six months of 2023 was approximately $7.5 million per month (or approximately $6.1 million excluding the Non-Debtor Affiliate).

---

additional debt funding to Crossbeam's equity investments . . . ." *See* https://techcrunch.com/2021/01/15/crossbeam-first-fund/ (last visited Aug. 26, 2023).  One of Crossbeam's principals that has attended meetings of the Parent's board of directors as Crossbeam's observer has an e-mail address with the handle @coventure.vc.

[11]      In some instances where there is insufficient space at the Amazon FBA center for inventory, the Debtors store inventory at third party warehouses.

(ii)     *Liabilities*

27.     Parent and Acrux have separate secured financing facilities and neither guarantees the debt of the other (other than pursuant to a contingent Bad Boy Guarantee (as defined below) at the Parent for the CoVenture Loan Agreement).

(a)   Parent Debt (SellersFunding)

28.     On March 12, 2021, Parent entered into that certain Revolving Loan Agreement (as amended by that certain Amendment No. 1 to Revolving Loan Agreement, dated March 24, 2021, as further amended by that certain Amendment No. 2 to Revolving Loan Agreement, dated December 23, 2021, and as further, amended, modified, waived, supplemented, extended and/or restated from time to time, the "Parent Loan Agreement") with SellersFunding International Portfolio Ltd., as lender ("SellersFunding").  The Parent Loan Agreement provides for a revolving loan facility with an initial commitment of more than $2 million, subject to quarterly upward adjustments.  The interest rate under the Parent Loan Agreement is 12% per year.

29.     On December 23, 2021, Benitago Inc. and SellersFunding entered into that certain Amendment No. 2 to the Parent Loan Agreement increasing the commitment amount under the Parent Loan Agreement to $8 million and extending the maturity date to January 16, 2025.

30.     Parent's obligations under the Parent Loan Agreement are secured by certain of the Parent's assets other than (i) the Parent's equity in its subsidiaries (such as Parent's equity interests in Acrux which is pledged under the CoVenture Loan Agreement as described below and equity interests in any subsidiaries of Acrux) and (ii) any assets of such subsidiaries (the "SellersFunding Collateral").  The SellersFunding Collateral includes, among other things, (a) certain present and future receivables owed to the Parent, (b) all present and future accounts relating to such

receivables and certain other accounts, including the accounts into which the receivables are paid, (c) certain equipment and inventory, and (d) all proceeds of the foregoing.[12]

31.    As of the Petition Date, the total amount outstanding under the Parent Loan Agreement is approximately $9.6 million.

(b) Acrux Debt (CoVenture)

32.    On February 26, 2021, Parent, as the Originator and Servicer, and Acrux, as the Borrower, entered into that certain Loan and Servicing Agreement (as amended by that certain Amendment No. 1 to Loan and Servicing Agreement, dated as of June 25, 2021, as further amended by that certain Amendment No. 2 to the Loan and Servicing Agreement, dated as of November 12, 2021, as further amended by that certain Amendment No. 3 to Loan and Servicing Agreement, dated as of April 27, 2022, and as further amended, modified, waived, supplemented, extended and/or restated from time to time, the "CoVenture Loan Agreement") with CoVenture – Bento Credit Opportunities GP, LLC, as Deal Agent (in such capacity, the "CoVenture Agent") and the lenders party thereto from time to time (together with the CoVenture Agent, "CoVenture").[13]

33.    The CoVenture Loan Agreement provided for initial commitments for a delayed draw term loan facility originally in the amount of $25 million, which was upsized to $50 million on June 24, 2021, and then to $150 million on November 12, 2021,

---

[12]    While certain of the amendments to the Parent Loan Agreement contemplated that the Parent's equity in its subsidiaries other than the Acrux Subsidiaries would be pledged as collateral under the Parent Loan Agreement, such equity pledges did not occur.  As of the Petition Date, Parent's equity in its subsidiaries other than Acrux, which are not Debtors in these Chapter 11 Cases, are not collateral under the Loan Agreements.

[13]    The lender under the CoVenture Loan Agreement is CoVenture – Bento Credit Opportunities SPV, LP.

in each case subject to the satisfaction of certain conditions.[14]  The interest rate under the
CoVenture Loan Agreement is approximately 14% per year, which results in
approximately $1 million in monthly interest costs which were deferred prior to the
Petition Date pursuant to the Waivers (as defined below) until June 2023, at which time
monthly interest became payable in kind pursuant to the July Forbearance Agreement
(as defined below).

34.     The obligations under the CoVenture Loan Agreement are secured
by a pledge of the Parent's equity in Acrux, a pledge of Acrux's equity in its
subsidiaries, including the Contributed Parties, and a lien on and security interest in the
assets of Acrux and the Acrux Subsidiaries (the "CoVenture Collateral").  Subsequent to
the parties' entry into the CoVenture Loan Agreement, on April 27, 2022, Parent entered
into a Contribution Agreement by and among Parent and Acrux Subsidiaries Phact LLC
("Phact"), Revati LLC ("Revati"), and Segin LLC ("Segin" and, together with Phact and
Revati, the "Contributed Parties"), pursuant to which Parent transferred certain assets
including the Amazon merchant accounts related to certain Organic Brands to each of
the Contributed Parties, which were joined to the CoVenture Loan Agreement as
guarantors and whose equity interests, which are now held by Acrux, were pledged as
Collateral under the CoVenture Loan Agreement.

35.     While Parent is a party to the CoVenture Loan Agreement in its
capacities as Originator and Servicer, the Parent is not obligated for the principal and
interest obligations thereunder.  In connection with the parties' entry into the
CoVenture Loan Agreement, on February 26, 2021, Parent executed a contingent

---

[14]   The parties had also discussed an additional $200 million in commitments available upon mutual
written consent.

Limited Guaranty (the "Bad Boy Guaranty") in favor of CoVenture guaranteeing certain
of the obligations under the CoVenture Loan Agreement in certain limited
circumstances upon the occurrence of one of more "Bad Boy Events" as outlined in the
Bad Boy Guaranty.

36.    As of the Petition Date, the total amount outstanding under the
CoVenture Loan Agreement is approximately $85 million, which consists of
approximately $74 million in principal and $11 million in deferred interest pursuant to
the Waivers and Forbearance Agreements.

## II.    EVENTS LEADING TO THESE CHAPTER 11 CASES
## AND THE DEBTORS' RESTRUCTURING GOALS

### A.    Market Changes

37.    The Debtors, like many e-commerce companies, have been severely
impacted by macroeconomic forces dictated by whipsawing consumer preferences
during an unprecedented and unpredictable, once-in-a-lifetime global pandemic.
Although it is clear now that the growth that the Debtors experienced during the early
stages of the COVID-19 pandemic is unsustainable in a post-pandemic consumer
climate, the Debtors remain a viable and innovative business that is sustainable (after
addressing the current liability overhang) on a reduced scale with more measured
growth.  Prior to acquisition of the Inorganic Brands, the Debtors were consistently
profitable and the Debtors had multiple profitable quarters prior to entering into the
CoVenture Loan Agreement.

38.    Beginning in 2020, the Debtors experienced explosive growth
fueled in large part by a shift in consumer habits toward online purchasing during the
early lock-down stages of the COVID-19 pandemic.  With the success and growth of the
Debtors' in-house developed Organic Brands, the Debtors raised significant funds

through two separate capital raises in February 2021 and November of 2021 from,
among others, CoVenture, to acquire the Inorganic Brands and expand the business.
Unfortunately, by the end of 2021—and after the acquisition of several new Inorganic
Brands—consumer habits began to shift back to pre-pandemic purchasing behavior.

39.     These negative trends accelerated in early 2022.  By May 2022, the
Debtors' largest competitor, Thrasio (which had been valued in 2021 between $5 billion
and $10 billion) collapsed, eroding market confidence in the entire sector and setting off
a flight of capital as financing opportunities evaporated.  With the Debtors' existing
financing priced upon 2020 and 2021 growth expectations that proved unrealistic in
light of market changes, the Debtors found themselves unable to generate sufficient
revenue to service the debt used to fuel acquisition of the Inorganic Brands during the
Debtors' growth phase.  Consequently, by the middle of 2022, the Debtors were forced
to approach CoVenture regarding waivers and, eventually, a restructuring of the debt
or a sale of certain assets to address the quickly changing economic reality.

**B.      Waivers and Forbearances with CoVenture**

40.     Initially, the Debtors sought waivers and forbearances with
CoVenture to allow time to enter into a sale transaction for Acrux, the Acrux
Subsidiaries and the Inorganic Brands with the proceeds being used to satisfy all or a
portion of the outstanding amounts due under the CoVenture Loan Agreement.  On
July 8, 2022, Parent, Acrux, and CoVenture entered into a Consent and Waiver of the
CoVenture Loan Agreement (the "First Wavier").  Among other things, the First Waiver
provided a waiver of certain specified defaults until August 31, 2022 and deferred
payment of interest for the three monthly periods ending June 30, July 31, and August
31, 2022.

41.     During the period of the First Wavier, the Debtors explored a potential sale of Acrux, the Acrux Subsidiaries and their Inorganic Brands.  Following discussions with several interested parties, the Debtors entered into a letter of intent with a potential buyer of specific assets in August 2022 that provided for total consideration of over $70 million (including all of the inventory related to the Inorganic Brands).  Unfortunately, the sale was unable to be consummated in part due to the continued deterioration of the e-commerce sector and the inability to reach an agreement with CoVenture related to the transaction.

42.     On September 29, 2022, Parent, Acrux, and CoVenture entered into a second Consent and Waiver of the CoVenture Loan Agreement (the "Second Waiver").  The Second Wavier is substantially similar to the First Waiver and provided a continued interest payment holiday until November 30, 2022, and deferred additional interest payments for the three monthly periods ending September 30, October 31, and November 30, 2022.

43.     In November 2022, in an effort to control costs, the Debtors further reduced the size of their team by 14% following prior reductions, primarily in the M&A and talent acquisitions departments in response to the continued e-commerce market downtrend.  In total, as of the Petition Date, the Debtors have reduced headcount by almost 40% from their highest levels.

44.     On November 14, 2022, Parent, Acrux, and CoVenture entered into another Consent and Waiver to the Loan Agreement (the "Third Wavier").  The Third Wavier included additional interest deferral through and including February 28, 2023.  The Third Wavier also required Parent to work in good faith to identify and begin negotiating with a backup servicer for Acrux acceptable to CoVenture and cooperate in

a commercially reasonable manner to finalize agreement with such backup servicer as soon as reasonably practicable.[15]

45.    In December 2022, the Debtors received another letter of intent with a different potential buyer for a transaction with total value of approximately $45 million.  The Debtors did not pursue this transaction after the potential buyer revised down their offer substantially as a result of a change in market conditions and the overall position of their business in light of the potential acquisition.

C.    **The CoVenture LOI**

46.    In December 2022, the Debtors delivered a term sheet (styled as letter of intent) (the "CoVenture LOI") to CoVenture and CrossBeam (which holds a substantial position of Parent's preferred shares that contain a liquidation preference as described in greater detail above) that contemplated a transaction that would provide for a comprehensive restructuring of the CoVenture Loan Agreement and related issues among the parties that allowed for a separation of the relationship among the parties.

47.    Negotiations continued through the expiration of the Third Wavier and thereafter pursuant to additional waivers and deferrals (together with the First Waiver, Second Waiver, and Third Waiver, the "Waivers") and were contentious at times.  Furthermore, during the negotiations, CoVenture, through its counsel, sent the Debtors, and myself and another employee a letter threatening claims and causes of action against myself and the other employee personally and for allegations of conversion and breach of fiduciary duty.  Notwithstanding these allegations, the Debtors were focused on their fiduciary duty to maximize value and pursue a value-maximizing outcome.

---

[15]    A backup servicer has not been engaged.

48.     After extensive negotiations, on March 24, 2023, the parties executed a substantially revised CoVenture LOI.  The CoVenture LOI provided, among other things, that the Debtors would sell/transfer to CoVenture (a) the equity interests in Acrux and the Acrux Subsidiaries (*i.e.*, the owners of the Inorganic Brands), and (b) the inventory related to the Inorganic Brands, subject to certain deductions and a third-party valuation.[16]  The CoVenture LOI contemplated that the Debtors would assist CoVenture in pursuing a sale of Acrux, the Acrux Subsidiaries and the Inorganic Brands after closing and that the Debtors would provide certain representations, warranties, and indemnification to CoVenture and the ultimate buyer, if any.  The parties agreed to use their commercially reasonable efforts to complete due diligence and cause the closing of the transactions contemplated by the CoVenture LOI by no later than March 31, 2023, which was subsequently extended as described in greater detail below.  Finally, the CoVenture LOI provided for mutual releases by and among the parties, subject to carve-outs for fraud.

### C.     Subsequent Negotiations to Implement the LOI and Forbearances

49.     Following execution of the CoVenture LOI, the parties and their advisors worked to prepare and negotiate the definitive documentation to effectuate the transactions under the CoVenture LOI.  Throughout that time, the Debtors had to repeatedly negotiate for continued waivers and forbearance to allow for those discussions to continue, which oftentimes CoVenture kept to very short periods that did not provide adequate breathing room to focus on the deal rather than preparing for alternatives.

---

[16]   The CoVenture LOI also provided that Acrux and the Acrux Subsidiaries would transfer back to Parent the assets of the Contributed Parties.

50.     The Debtors requested a further extension of the Waivers beyond June 30, 2023 to continue to pursue the CoVenture LOI, but, unlike prior Waivers, CoVenture demanded that the Debtors pay cash interest to CoVenture on a monthly basis, which would cost nearly $800,000 per month.  This demand followed the Debtors' continuing for months to incur and pay substantial costs that the Debtors were unable to avoid because of covenants in prior Waivers that precluded the Debtors from altering their service of the Inorganic Brands without CoVenture's consent.  Nevertheless, the Debtors and their advisors continued to engage in good faith with CoVenture and its counsel to find a path forward around the CoVenture LOI.

51.     Following several limited extensions by email of the CoVenture LOI, Waivers, and related forbearance after June 30, 2023—in some cases just a single day or two—on July 9, 2023, the Debtors and CoVenture reached agreement on a forbearance agreement through the end of July 31, 2023 (the "July Forbearance Agreement") as well as an accompanying extension of the CoVenture LOI.  Pursuant to the July Forbearance Agreement, the Debtors agreed to provide certain financial reporting to CoVenture and satisfy certain milestones, including for the engagement of a financial advisor and appointment of a special manager for Acrux and the Acrux Subsidiaries, each of which was reviewed, commented on, and consented to by CoVenture.[17]  The July Forbearance Agreement also required the Debtors, with the assistance of Portage Point to undertake an allocation of costs associated with each of Parent, on the one hand, and Acrux and the Acrux Subsidiaries, on the other hand.

---

[17]     As explained above, on July 18, 2023, Acrux appointed Mr. Jindal as the Special Manager, and also on July 18, 2023, the Debtors engaged Triple P RTS, LLC, a wholly owned subsidiary of Portage Point Partners, LLC ("Portage Point") as their financial advisor.

Finally, the July Forbearance Agreement required Acrux to begin making payment-in-kind interest payments for the monthly period beginning June 2023 and thereafter.

52.     Towards the end of July 2023 and early August 2023, the Debtors negotiated with CoVenture for, and obtained, a further forbearance through August 31, 2023 (the "August Forbearance Agreement"), subject to certain milestones and requirements.  Among other things, the August Forbearance Agreement required the Debtors to agree to CoVenture's preferred tax structure for the transaction by August 11, 2023, a pre-closing transition plan by August 14, 2023, and finalizing the documentation for the transaction by August 24, 2023 with closing to occur by August 31, 2023.  In particular, the pre-closing transition plan was important because Acrux's and the Acrux Subsidiaries' assets consists solely of IP and Amazon merchant accounts and, as such, CoVenture would be required to obtain substantial enterprise and operational support to continue to run Acrux and the Acrux Subsidiaries after closing, including pursuant to a transition services agreement with the Parent.  The August Forbearance Agreement contained a substantial $50,000 per day penalty against Parent for each day where the Debtors failed to satisfy a milestone until it was cured.  In connection with continuing to negotiate towards closing the transactions under the CoVenture LOI and the above-referenced transition plan, the Debtors provided extensive diligence information to CoVenture including identification of employees and suppliers related to the Acrux brands.

53.     In mid-August 2023, it became clear that the parties were not likely to satisfy the August 24, 2023 milestone for finalizing the documentation.  Among other things, substantial issues remained between the parties, particularly around indemnification for representations and warranties in the proposed purchase agreement, which would have created substantial post-closing costs and risks on the

Parent following consummation of the transaction.  In addition, CoVenture delayed

providing information central to the negotiations, such as the inventory appraisal data

that it had obtained that was expressly contemplated by the CoVenture LOI, which

affected the Debtors' ability to negotiate the deal.  Finally, the Debtors' tax advisors'

analysis remained ongoing around the impact of the transaction to the Debtors.

54.    Beginning on August 16, 2023, the Debtors approached CoVenture

with numerous proposed alternatives to the CoVenture LOI, all of which were initially

rejected.  Prior to the Petition Date, on August 28, 2023, the Debtors again approached

CoVenture to reiterate several alternatives and describe substantial improvements

thereto, including a modified and streamlined alternative to the CoVenture

LOI.  CoVenture responded with its own proposal, which the Debtors and their

advisors reviewed and determined after discussions with CoVenture that it would be

unworkable in light of the Debtors' future cash flow forecasts.  CoVenture also refused

to indicate that it would be willing to waive the $50,000 per day penalty under the

existing forbearance agreement.

55.    In light of the substantial penalties that would accrue against the

Debtors under the existing forbearance and no agreement in principle on an out of court

workout or other path forward, on August 28, 2023, the Board authorized the filing of a

chapter 11 petition for Benitago Inc., and I understand that the Special Manager

authorized a filing for Acrux and the Acrux Subsidiaries.  Following those approvals,

the Debtors and the Special Manager and their respective advisors nevertheless

continued to engage with CoVenture and its advisors to reach agreement on a path

forward, but none was obtained and CoVenture would not waive the forbearance

penalties.  Thus, on Wednesday, August 30, 2023 (i.e., the Petition Date), the Debtors

commenced these Chapter 11 Cases.  The Debtors remain hopeful that they will be able

to reach a consensual resolution with all their various stakeholders in a transparent,
court-supervised process.

> **D.**    **The Debtors' Purpose for these Chapter 11 Cases**

> > (1)    Sale Process for Acrux / Acrux Subsidiaries and Related Inventory

56.    Although the Debtors experienced steady profitable growth during
their formative years and explosive growth during the early pandemic, by the
beginning of 2022 it was apparent that such growth, and the capital structure that
fueled it, was not sustainable.  Thus, a comprehensive restructuring is required.  As
detailed above, the Debtors considered multiple out-of-court solutions, including a
potential sale of Acrux, the Acrux Subsidiaries and the Inorganic Brands and a
consensual work-out with CoVenture.

57.    Over the past few months, the Debtors have received indications of
interest from potential buyers, which the Debtors understand are willing to promptly
commence diligence.  In connection with negotiating the CoVenture LOI transactions,
the Debtors have also prepared extensive diligence information that would be relevant
for any buyers.  The Debtors anticipate shortly filing a motion for approval of
customary bidding and auction procedures to facilitate the sale of Acrux, the Acrux
Subsidiaries and the Inorganic Brands and the Parent's inventory related thereto
(the "Bidding Procedures Motion").

58.    Given the interest received to date, the Debtors are hopeful that a
sale process, overseen by the Court, will lead to one or more offers that will maximize
the value of their assets and distributions to their creditors.  In connection with the
Debtors' engagement of Triple P RTS, LLC to provide a Chief Restructuring Officer,
Portage Point will also be assisting the Debtors with their postpetition marketing efforts
and diligence with potential buyers.  To facilitate the sale, the Parent is willing to

negotiate with buyers to include the inventory owned by the Parent related to Acrux and the Acrux Subsidiaries, which will further enhance the value obtained in connection with the sale as well as provide operational support for a buyer through their experience and certain other assets pursuant to a transition services agreement to be negotiated and other documentation.

59.    Although the Debtors expect to file the Bidding Procedures Motion on or about the Petition Date, the Debtors are not seeking approval of the Bidding Procedures Motion until after the U.S. Trustee appoints an official committee of unsecured creditors (if one is appointed) and expect to request a hearing on the Bidding Procedures Motion approximately thirty (30) days from the Petition Date.  As will be explained in the Bidding Procedures Motion, the Debtors will file a supplement to that motion and a revised proposed form of bidding procedures order that will provide for, among other things, the proposed timeline for the sale process.

(2)    Addressing the Relationship Between Parent and Acrux

60.    The Debtors are mindful of potential conflicts or the appearance of potential conflicts between Parent, on the one hand, and Acrux and the Acrux Subsidiaries, on the other hand.  As noted above, prior to the Petition Date, Acrux and the Acrux Subsidiaries have engaged Mr. Jindal as the Special Manager with authority over certain bankruptcy and restructuring transactions and conflicts of interest that may exist with respect to the Parent (which engagement was agreed to by CoVenture). Acrux and the Acrux Subsidiaries have also retained bankruptcy co-counsel at Klestadt, Winters, Jureller, Southard & Stevens, LLP ("Klestadt") to assist and advise the Special Manager, including with respect to potential conflicts of interest between Parent and Acrux.  The Debtors believe that a separate fiduciary for Acrux with its own counsel to

23

review and analyze transactions between the Parent and Acrux during these Chapter 11 Cases will guard against potential conflicts. [18]

61.     The Debtors intend to continue to perform under the Intercompany Agremeent on a postpetition basis even though Parent will not be repaid by Acrux and the Acrux Subsidiaries for postpetition inventory and services provided thereunder until after the entry of an order approving the Cash Collateral Motion (as defined in the Studebaker Declaration).  Thus, during these Chapter 11 Cases, Parent will continue to pay all expenses on behalf of itself and all Debtors consistent with the Intercompany Agreement.  Parent reserves its right to argue that its claims against Acrux and the Acrux Subsidiaries for the fair market value of the inventory and services that it provides exceeds the amounts charged under the Intercompany Agreement.  While I understand that Acrux and the Acrux Subsidiaries will only be able to pay the amounts owed after the Petition Date under the Intercompany Agreement after the Court approves the Cash Collateral Motion, the Parent is willing to continue to operate under the terms of the Intercompany Agreement and provide inventory and services despite not receiving any payments thereunder for the next several weeks pending a Court order.

62.     By continuing to perform under the Intercompany Agreement, Parent is effectively financing the Acrux and Acrux Subsidiaries in these Chapter 11 Cases.  That support is critical to allow Acrux and the Acrux Subsidiaries to continue to operate in the ordinary course pending the conclusion of the sale process without disruption to their business or loss in value to their brands.

---

[18]   I understand that, prior to the Petition Date, the Special Manager was in the process of reviewing the historical relationship between Parent and Acrux / the Acrux Subsidiaries, including considering potential claims and causes of action that Acrux / the Acrux Subsidiaries may have against the Parent.

*                 *                 *

63.     Thus, the Debtors intend to use these Chapter 11 Cases to conduct a transparent process to maximize value, sell portions of the business to provide maximum returns to creditors, and to reorganize around the Parent as a company focused on the Organic Brands and a more sustainable growth pattern.  The Debtors hope to work constructively with all parties to efficiently reach a resolution that maximizes value for all parties.  Given the administrative expenses and burdens of these Chapter 11 Cases on the Debtors, which has just a small workforce of key employees, the Debtors are actively working to reorganize as quickly as possible so that value may be preserved for the benefit of all stakeholders.

## III.   ADDITIONAL DISCLOSURES REQUIRED UNDER LOCAL BANKRUPTCY RULE 1007-2

64.     Local Bankruptcy Rule 1007-2 requires that the Debtors provide certain information, which is set forth below:

- Local Bankruptcy Rule 1007-2(a)(2):  not applicable to these Chapter 11 Cases because such cases were not originally commenced as a chapter 7, chapter 12, or chapter 13 case;

- Local Bankruptcy Rule 1007-2(a)(3):  **Exhibit B** lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation;

- Local Bankruptcy Rule 1007-2(a)(4):  **Exhibit C** lists the following information with respect to each of the holders of the Debtor's twenty (20) largest unsecured claims, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtors' accounts, the amount of the claim, and an

indication of whether the claim is contingent, unliquidated, disputed, or partially secured;[19]

- <u>Local Bankruptcy Rule 1007-2(a)(5)</u>: **Exhibit D** lists the holders of the five largest secured claims against the Debtors;

- <u>Local Bankruptcy Rule 1007-2(a)(6)</u>: **Exhibit E** provides a summary of the unaudited assets and liabilities for the Debtors;

- <u>Local Bankruptcy Rule 1007-2(a)(7)</u>: **Exhibit F** provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held;

- <u>Local Bankruptcy Rule 1007-2(a)(8)</u>: **Exhibit G** provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending;

- <u>Local Bankruptcy Rule 1007-2(a)(9)</u>: **Exhibit H** provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business;

- <u>Local Bankruptcy Rule 1007-2(a)(10)</u>: **Exhibit I** provides the location of the Debtors' substantial assets, and the location of their books and records;

- <u>Local Bankruptcy Rule 1007-2(a)(11)</u>: **Exhibit J** provides a list of actions against the Debtors;

- <u>Local Bankruptcy Rule 1007-2(a)(12)</u>: **Exhibit K** provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience;

- <u>Local Bankruptcy Rule 1007-2(b)(1)–(2)</u>: **Exhibit L** provides the estimated amount to be paid to the Debtors' employees (not including officers, directors, and stockholders), and the estimated amount to be paid to the Debtors' officers, stockholders, directors,

---

[19] In each case, the claim amounts are estimated and subject to verification. The Debtors reserve all rights, including to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

and financial and business consultants retained by the Debtors for the thirty (30)-day period following the Petition Date;  and

- <u>Local Bankruptcy Rule 1007-2(b)(3)</u>:  **Exhibit M** sets forth, for the thirty (30)-day period following the Petition Date, estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue but remaining unpaid, other than professional fees, and other information relevant to the foregoing.

65.    Copies of the resolutions authorizing the filing of the Debtors'

chapter 11 petitions are annexed thereto.

[*Remainder of page left blank intentionally; signature page follows*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: August 31, 2023
New York, New York


By:  */s/ Santiago Nestares Lampo*
Name:  Santiago Nestares Lampo
Title:    Co-Founder & Chief Executive Officer