UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | **Chapter 11** |
| **BENITAGO INC.,** *et al.,* | **Case No. 23-11394 (SHL)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

### DECLARATION OF THOMAS STUDEBAKER,
### THE DEBTORS' CHIEF RESTRUCTURING OFFICER ,
### PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT
### OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Thomas Studebaker, being duly sworn, hereby depose and state as follows:

1.      I am the Chief Restructuring Officer of Benitago Inc. ("Parent") and the other debtors and debtors in possession (together with Parent, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") and have served in such capacity since August 28, 2023.

2.      I am a Managing Director and Co-Head of Turnaround and Restructuring at Triple P Services, LLC with its principal place of business at 300 North LaSalle Drive, Suite 1420, Chicago, Illinois 60654.  Triple P Services, LLC and Triple P RTS, LLC are both wholly owned by Portage Point Partners, LLC ("Portage Point") and since mid-July 2023, Triple P RTS, LLC has served as the Debtors' financial advisor.

---

[1]      The last four digits of Benitago Inc.'s tax identification number are 4084.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/benitago.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  1 Liberty Street, Ste. 320, New York, New York 10006.

3.      I submit this declaration (the "Declaration") in support of the

Debtors' chapter 11 petitions and first day pleadings (the "First Day Pleadings") filed

contemporaneously herewith.

4.      On August 30, 2023 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern

District of New York (the "Court").  Filed contemporaneously herewith is the

*Declaration of Santiago Nestares Lampo Pursuant to Local Bankruptcy Rule 1007-2 and in*

*Support of the Debtors' Chapter 11 Petitions* (the "Nestares Lampo Declaration") which

sets forth a description of the facts and circumstances of these Chapter 11 Cases.

5.      Unless otherwise indicated, the statements set forth in this

Declaration are based upon (a) my personal knowledge of the Debtors' business,

(b) information learned from my review of relevant documents, (c) information I

received from the Portage Point team working under my supervision or the Debtors'

management team and other advisors, or (d) my experience and my knowledge of the

Debtors' business.  I am not being specifically compensated for this testimony other

than through payments that are proposed to be received by Portage Point as a

professional retained by the Debtors.  If I were called upon to testify, I could and would

competently testify to the facts set forth herein.  I am authorized to submit this

Declaration on behalf of the Debtors.

## BACKGROUND AND QUALIFICATIONS

6.      Portage Point is a business advisory, interim management,

investment banking, and financial services firm whose professionals have a wealth of

experience in providing financial advisory, restructuring advisory, and turnaround

management services and enjoys an excellent reputation for services it has rendered on

behalf of debtors and creditors throughout the United States, both in chapter 11 proceedings and in out of court restructurings.  The Portage Point team is comprised of operators and advisors with proven skills necessary to identify, preserve, and create value in the most challenging and complex situations.  Portage Point's professionals have extensive experience across a wide range of industries.

7.    I specialize in providing leadership to troubled and underperforming companies.  I have nearly twenty years of restructuring experience, including in the areas of liquidity management, business plan development, evaluation of strategic alternatives, contingency planning, bankruptcy administration, and the negotiation of plans of reorganization.  In the past I have also served as Chief Operating Officer to two public companies where I oversaw all operations and restructuring activities, as Chief Financial Officer of a privately owned company, interim Chief Financial Officer to a private-equity owned global consulting company, and as restructuring advisor in various successful in and out-of-court restructurings.

8.    I joined Portage Point in May 2023.  Prior to that, I was a Partner and Managing Director at AlixPartners.  While at AlixPartners, I served as Chief Operating Officer (COO) to two public global renewable energy companies, interim Chief Financial Officer (CFO) to a privately owned energy company, interim CFO to a PE owned global consulting company and restructuring advisor to a variety of companies across the technology, energy, business services and retail sectors.  I obtained a Master of Business Administration degree from Northwestern University's J.L. Kellogg School of Management, and a bachelor's degree from the University of Notre Dame.  I am also a Certified Insolvency and Restructuring Advisor.

9.    Since the Debtors engaged Triple P RTS, LLC in mid-July of 2023, members of a team that I supervise have worked closely with the Debtors' management

3

and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in prepared cash flow projections, budgets, and other financial information.  I have been a part of that team since mid-August 2023.

10.     Based on my work with the Debtors, I am generally familiar with the Debtors' business, financial condition, day-to-day operations, and books and records.  Except as otherwise noted herein, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from my review of the Debtors' business records and from other members of the Debtors' senior management team, the Debtors' employees and other advisors (including members of the Portage Point team) in the ordinary course of my responsibilities.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## **FIRST DAY PLEADINGS**[2]

11.     Substantially contemporaneously with the filing of this Declaration, the Debtors have filed usual and customary First Day Pleadings, and, at the "first day" hearing (the "First Day Hearing") will seek orders granting various forms of relief.  The First Day Pleadings include the following:

- **Joint Administration Motion.**  Debtors' Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion");

- **Creditor Matrix Motion.**  Debtors' Motion for Entry of an Order (I) Waiving Certain List Filing Requirements; (II) Authorizing the Filing of a Consolidated List of Top 20 Unsecured Creditors; and (III) Authorizing Debtors to Establish Procedures for Notifying Parties of the Commencement of These Cases (the "Creditor Matrix Motion");

- **Schedules/SOFAs Extension Motion.**  Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules and Statements; and

---

[2]   Capitalized terms used but not defined herein have the correlative meaning ascribed to such term as in the Nestares Lampo Declaration or the corresponding First Day Pleading, as applicable.

(II) Granting Additional Time to File Reports of Financial Information Required Under Bankruptcy Rule 2015.3 (the "Schedules Extension Motion");

- **Notice & Claims Agent Application.** Debtors' Application for Entry of an Order (I) Authorizing and Approving the Appointment of Stretto, Inc. as Claims and Noticing Agent and (II) Granting Related Relief (the "Claims Agent Application");

- **Cash Management Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, Including Existing Bank Accounts, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Bank Accounts and Utilize Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, Subject to the Postpetition Escrow Proceudres; (II) Extending the Time to Comply With, or Seek Waiver of 11 U.S.C. § 345(b); and (III) Granting Related Relief (the "Cash Management Motion");

- **Cash Collateral Motion.** Debtors' Motion for Entry of an Order (I) Authorizing the Debtors' Use of Cash Collateral and (II) Granting Related Relief (the "Cash Collateral Motion");

- **Wages Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; and (II) Granting Related Relief (the "Wages Motion");

- **Critical Vendors Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief (the "Vendor Motion");

- **Taxes Motion.** Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Taxes and Fees; (II) Continue Prepetition Surety Bond Programs in the Ordinary Course of Business and Pay All Obligations Related Thereto; and (II) Granting Related Relief (the "Taxes Motion"); and

- **Automatic Stay Motion.** Debtors' Motion for Entry of an Order (I) Enforcing the Protections of 11 U.S.C. §§ 362, 365, 525 and 541(c);

(II) Approving the Form and Manner of Notice; and (III) Granting Related Relief (the "Stay Confirmation Motion").

12.     The First Day Pleadings seek authority to, among other things, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers to ensure that the Debtors' business operations are not disrupted by these Chapter 11 Cases, and continue the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible. The Debtors have tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  An immediate and orderly transition into these Chapter 11 Cases is critical to the viability of the Debtors' operations and any delay in granting the relief described in the First Day Pleadings could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first twenty-one (21) days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this important juncture.

13.      I am familiar with the content and substance contained in each First Day Pleading and believe that the relief sought in each pleading (a) is necessary to enable the debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtors' successful restructuring, and (c) best serves the Debtors' estates.  I have reviewed each of the First Day Pleadings or have otherwise had their contents explained to me, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings is important to the Debtors' ability to transition to chapter 11 with minimum interruption or loss of value.

**A.   Debtors' Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion").**

14.     By the Joint Administration Motion, the Debtors are seeking entry of an order consolidating their 29 Chapter 11 Cases for procedural purposes only and having such cases jointly administered.  Joint administration will provide significant administrative convenience without harming the substantive rights of any party in interest.  Moreover, joint administration will be more efficient, convenient for the Court and cost-effective for all parties in interest.

15.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest.  Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

**B.   Debtors' Motion for Entry of an Order (I) Waiving Certain List Filing Requirements; (II) Authorizing the Filing of a Consolidated List of Top 20 Unsecured Creditors; and (III) Authorizing the Debtors to Establish Procedures for Notifying Parties of the Commencement of these Cases (the "Creditor Matrix Motion").**

16.     By the Creditor Matrix Motion, the Debtors are seeking entry of an order (a) waiving the requirements applicable to creditor list filing pursuant to section 521(a)(1) of the Bankruptcy Code, Bankruptcy Rule 1007(d), and Local Bankruptcy Rule 1007-1 (collectively, the "List Filing Requirements"), and (ii) (A) authorizing the Debtors to establish certain procedures (the "Commencement Procedures") for providing notice to parties of the commencement of the Chapter 11 Cases and of the meeting of creditors pursuant to sections 341 and 342 of the Bankruptcy Code and (B) approving the form of notice of commencement (the "Notice of Commencement").

17.     Under the circumstances, I believe that reformatting the creditor list, preparing and formatting a creditor matrix, and otherwise complying with the List

Filing Requirements will impose unnecessary administrative burdens on, and will distract, the Debtors without any corresponding benefit to their estates. Additionally, because the Debtors operate a single business enterprise, compiling separate top twenty creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources without any corresponding benefit to their estates, and a consolidated list Top 20 Unsecured Creditors should be authorized.

18.     The Debtors believe that service of the Notice of Commencement by regular first-class mail and email, where available, will maximize efficiency in administering these Chapter 11 Cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. In addition, the Debtors will endeavor to serve the Notice of Commencement by email where possible. The Commencement Procedures ensure that the Debtors' creditors receive prompt notice of the commencement of these Chapter 11 Cases and of the meeting of creditors held pursuant to section 341 of the Bankruptcy Code (the "341 Meeting").

19.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Creditor Matrix Motion should be approved.

**C.     Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules and Statements; and (II) Granting Additional Time to File Reports of Financial Information Required under Bankruptcy Rule 2015.3 (the "Schedules Extension Motion").**

20.     By the Schedules Extension Motion, the Debtors are seeking entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") by fourteen (14) days through and including September 27, 2023 (the "Extended Schedules Filing Deadline", and (b) extending the deadline by which the

Pg 9 of 31

Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3(d) (the "Rule 2015.3 Reports") to 14 days after the first 341 Meeting, in each case, without prejudice to the Debtors' ability to request additional extensions.

21.     The Debtors consist of 29 different entities.  To prepare the Schedules and Statements, the Debtors and their professionals must review and compile information from books, records and other documents relating to, among other things accounts payable and receivable, intellectual property and licensing, employee wages and benefits, and intercompany transactions.  The Debtors have a limited number of employees who will be required to collect the extensive information needed for each of the twenty-nine separate Debtors to compile their respective Schedules and Statements while also attending to the other needs of these Chapter 11 Cases and continuing to operate the Debtors in the ordinary course.

22.     To prepare the Rule 2015.3 Reports, the Debtors must compile information from books, records, and documents relating to a multitude of transactions at numerous locations around the country and in Europe.  In addition, the Debtors' employees and advisors are engaged in numerous other tasks necessary to facilitate these Chapter 11 Cases, including the preparation of various other schedules, reports, and other papers required by the Bankruptcy Code and the Bankruptcy Rules.  The combination of these tasks has imposed substantial burdens on the Debtors' management, personnel, and advisors, in addition to the day-to-day operations of the Debtors' businesses.

23.     The Debtors intend to work cooperatively with the U.S. Trustee and any other necessary parties in these Chapter 11 Cases to provide access to relevant

information regarding the business and financial affairs of the Debtors and their non-debtor subsidiaries.

24.     I believe that the relief requested in the Schedules Extension Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest.  Accordingly, I respectfully submit that the Schedules Extension Motion should be approved.

**D.     Debtors' Application for Entry of an Order (I) Authorizing and Approving the Appointment of Stretto, Inc. as Claims and Noticing Agent and (II) Granting Related Relief (the "Claims Agent Application").**

25.     By the Claims Agent Application, the Debtors seek entry of an order appointing Stretto, Inc. ("Stretto") as the claims and noticing agent for the Debtors in connection with these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim in the Chapter 11 Cases.

26.     I have reviewed Stretto's engagement agreement, which is attached as an exhibit to the Claims Agent Application, and the description of services that Stretto has agreed to provide and the compensation and other terms of the engagement as provided in its engagement agreement.  Based on that review, I believe that the Debtors' estates, creditors, parties in interest and the Court will benefit from Stretto's experience and cost-effective methods.  Prior to retaining Stretto, the Debtors also solicited and reviewed proposals from two other potential claims and noticing agents. The Debtors believe, and I agree, that Stretto's rates are competitive and reasonable given Stretto's quality of service and expertise and that the appointment of Stretto as claims and noticing agent is the most effective and efficient manner by which to provide noticing and claims processing services in these Chapter 11 Cases.

27.     I believe that the relief requested in the Claims Agent Application is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Claims Agent Application should be approved.

**E.     Debtors' Motion for Entry of an Order (I) Enforcing the Protections of 11 U.S.C. §§ 362, 365, 525 and 541(c); (II) Approving the Form and Manner of Notice; and (III) Granting Related Relief (the "<u>Stay Confirmation Motion</u>").**

28.     By the Stay Confirmation Motion, the Debtors are seeking entry of an order confirming the protections of sections 105(a),362, 365, 525, and 541(c) of the Bankruptcy Code and approving the form and manner of notice related thereto.

29.     The Debtors operations occur in China, the United States, and Europe, with their inventory moving through international pathways at locations outside of the United States.  As a result, the Debtors have foreign creditors and counterparties who may not be well-versed in the restrictions of the Bankruptcy Code. It is my understanding that many of these creditors and counterparties do not transact business on a regular basis with companies that have filed for chapter 11 or are unfamiliar with the scope of a debtor-in-possession's authority to conduct its business. I believe that these creditors may be unfamiliar with the operation of the automatic stay and other provisions of the Bankruptcy Code.  I believe an affirmative court order will make the impact of the automatic stay and its applicability to creditors and counterparties wherever located clearer to such creditors and counterparties.

30.     In addition, the Debtors are parties to contracts and possess licenses or other forms of permits from governmental units located throughout the world, both domestically and internationally, that are necessary to the conduct of the Debtors' business.  I believe that certain of these foreign governmental units may not be

cognizant of the protections afforded to the Debtors by the Bankruptcy Code, and, therefore, may inadvertently contravene its provisions. I believe that an affirmative court order will ensure that governmental units worldwide do not hamper the Debtors' operations in contravention of the protections of the Bankruptcy Code regarding relationships with governmental entities.

31.     Accordingly, I believe that the relief requested in the Stay Confirmation Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Stay Confirmation Motion should be approved.

**F.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors' Use of Cash Collateral and (II) Granting Related Relief (the "Cash Collateral Motion").**

32.     By the Cash Collateral Motion, the Debtors request entry of an order (the "Proposed Order") (a) authorizing the Debtors to use Cash Collateral (as defined in section 363(a) of the Bankruptcy Code) of the Prepetition Secured Parties and (b) granting related relief. The Debtors seek authority to use Cash Collateral to operate their business in the ordinary course while they pursue their chapter 11 strategy, including the proposed sale of Acrux's and the Acrux Subsidiaries' assets and related inventory.

33.     As set forth in the Budget attached as Exhibit 1 to the Proposed Order (the "Budget"), the Debtors require access to cash in the accounts held in Parent's name, which is SellersFunding Collateral. By continuing to use this cash as the Debtors have prior to the filing of these Chapter 11 Cases in the ordinary course, the Debtors will continue to operate their businesses, sell and monetize inventory, and continue to operate their valuable brands for the benefit of all stakeholders, including the

Prepetition Secured Parties.  By maintaining their operations, the Debtors will also best position their assets for the proposed sale.

34.    Based on the value of the SellersFunding Collateral, the Debtors believe that SellersFunding is substantially oversecured—indeed, the value of the cash on hand in the Parent's bank accounts (approximately $6.6 million, together with the value of inventory owned by Parent (approximately $17 million), substantially exceeds the outstanding amount owed to SellersFunding (approximately $9.6 million). Furthermore, neither SellersFunding nor CoVenture will experience a decline in the value of their respective collateral if the Debtors continue to operate their business as they have prior to the Petition Date, which will preserve and enhance the value of these assets.  As such, the Debtors are proposing that SellersFunding will receive ongoing postpetition payments of interest and fees consistent with the Parent Loan Agreement on account of its oversecured status.  The Debtors will provide both SellersFunding and CoVenture with updated Budgets and reporting so that they may monitor the Debtors' business.

35.    The Debtors propose that, pending entry of the Proposed Order, Acrux and the Acrux Subsidiaries will segregate and escrow all postpetition cash, including all cash on hand as of the Petition Date and amounts generated by Acrux and the Acrux Subsidiaries on account of the sale of inventory provided by the Parent to Acrux and the Acrux Subsidiaries (on consignment) consistent with prepetition practices.  Following entry of the Proposed Order, Parent, Acrux and the Acrux Subsidiaries will operate under the Intercompany Agreement, subject to the Parent's reservation of rights to claim amounts additional to those set forth in the Intercompany Agreement.  Thus, pending entry of the Proposed Order, the Debtors are only seeking to use receipts collected by Parent related to the Organic Brands owned by Parent,

which is SellersFunding Collateral.  Proceeds collected on account of the brands owned

by Acrux and the Acrux Subsidiaries, which is CoVenture Collateral, will be set aside in

a newly-created, segregated escrow account (the "Acrux Escrow"), pending further

order of the Court.[3]  As explained in greater detail below, by continuing to operate the

Debtors' ongoing business operations in the ordinary course after the Petition Date,

including by way of Parent continuing to fund and pay all of the ongoing operational

costs for Acrux and the Acrux Subsidiaries, the value of the CoVenture collateral

improves after the Petition Date.  Because the value of the CoVenture collateral will not

decline, and in fact, will be enhanced by the Debtors' continued operation, the Debtors

submit that CoVenture is adequately protected.

        36.    Without access to Cash Collateral, the Debtors will have insufficient

liquidity to continue operating their business in the normal course and to pay the costs

and expenses of these Chapter 11 Cases.  The Debtors will be forced to substantially

limit their operations and curtail expenses, which will result in a reduction in the sales

volume across their brands and reduce critical revenue.  Any disruption in the sale of

inventory through Amazon could cause short- and long-term harm to the intellectual

property and brands held by the Acrux Subsidiaries because it could result in

competing products receiving higher placement on Amazon searches thereby

promoting competitors' products to the Debtors' detriment.

        37.    Any disruption in the sale of inventory through Amazon would

harm the Debtors' intellectual property and brands.  The Amazon marketplace is

extremely competitive.  When a product runs out of stock, the Debtors not only lose

---

[3]    The Postpetition Escrow Procedures and other terms and conditions regarding the Acrux Escrow is
set forth in the Cash Management Motion.

competitive market share, but also lose customer acquisition. Among other things, customers switch to competitor brands and may become disgruntled with the lack of availability of the Debtors' products. Additionally, inventory stock outs could cause the Debtors to lose visibility into historical sales performance thereby significantly hampering their demand planning and procurement capabilities.

38.     The Debtors' data shows that sales volume is a major driver of search placement on Amazon—the relative visibility afforded to similar products on Amazon's webpage. The Debtors believe that maintaining sales volume is a critical driver of Amazon rankings, which are both short- and long-term weighted and include feedback "loops" where higher rankings generate more sales (and vice versa). However, the opposite is also true, and sellers must be vigilant to maintain high sales volume and ratings to avoid falling down in Amazon rankings. If that occurs, the Debtors' competitors have an opportunity to sell similarly situated products to increase their relative share of sales and to increase their own relative Amazon rankings.

39.     Thus, when a seller's product goes out of stock, there is not only short-term harm (both from the seller not generating revenue due to the lack of sales and from alternative sellers gaining an opportunity to overtake the seller's position) but also long-term harm (where negative rankings can remain in the historical view of the product for up to a year or more). To regain rankings after going out of stock, a seller needs to aggressively market their products, including by spending substantial amounts on advertising, reducing the price to increase sales, which may result in selling at break-even costs or even a loss.

40.     Amazon owns the rights to the Debtors' product listings; sellers like the Debtors own the associated merchant accounts and intellectual property and trademarks associated with the products sold through those accounts under the

15

Amazon listing.  When a seller's product is out of stock, Amazon promotes other sellers,
which can include sellers of counterfeit goods that customers mistakenly believe to be
sold by the Debtors and therefore result in negative reviews and further harms the
Debtors' brands.

41.     Finally, when a seller's product is out of stock, that seller loses the
benefit of current advertising data (referred to as "pay per click" or "PPC" data)
because the seller is no longer bidding for advertisements.  Without up-to-date PPC
data, a seller lacks visibility into ad pricing, including short-term price bids and trends,
and consumer preferences, which is key to achieving high Amazon rankings and
maximizing sales.

42.     Accordingly, I believe that the relief requested in the Cash
Collateral Motion is in the best interests of the Debtors' estates, creditors, and all other
parties in interest.  Accordingly, I respectfully submit that the Cash Collateral Motion
should be approved.

   **G.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing
          the Debtors to (A) Continue to Operate Their Cash Management
          System, Including Existing Bank Accounts, (B) Honor Certain
          Prepetition Obligations Related Thereto, (C) Maintain Existing Bank
          Accounts and Utilize Existing Business Forms, and (D) Continue to
          Perform Intercompany Transactions, Subject to the Postpetition Escrow
          Procedures; (II) Extending the Time to Comply With, or Seek Waiver of
          11 U.S.C. § 345(b); and (III) Granting Related Relief (the "Cash
          Management Motion").**

43.     By the Cash Management Motion, the Debtors are seeking entry of
interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue to
use their existing cash management system (the "Cash Management System") as
described in the Cash Management Motion, (b) honor certain prepetition obligations
related thereto; (c) continue using existing various preprinted business forms (the
"Business Forms"), such as letterhead and checks, in the ordinary course of business;

(d) authorizing the Debtors to continue to perform intercompany transactions with each

other and the Non-Debtor Affiliate (as defined below) on a postpetition basis in the

ordinary course of business and according administrative expense priority status to

postpetition intercompany transactions; (ii) extending the deadline to comply with, or

seek a waiver of, section 345(b) of the Bankruptcy Code; and (iii) granting related relief.

44.     The Debtors have designed the Cash Management System to meet

their operating needs, enable management to control and monitor corporate funds,

ensure cash availability and liquidity, comply with the requirements of their lending

arrangements, reduce administrative expenses by facilitating the movement of funds,

and enhance the development of accurate account balances.  The Cash Management

System has several main functions:  (a) cash collection, including the collection of

payments made to the Debtors from revenue generated in the ordinary course of

business; (b) cash disbursements to fund the Debtors' primary debt obligations and

business operations, which primarily consist of payroll, capital expenditures, research

and development costs, maintenance costs, and payments to vendors and service

providers; and (c) cash transfers and pooling within the Debtors and their Non-Debtor

Affiliate, Benitago Ltd.  A summary of the Debtors' and Non-Debtor Affiliate's Bank

Accounts are as follows:

45.     *Benitago Inc.*  Parent has four Bank Accounts in its name:  two with

First Republic Bank ("First Republic"), one with Brex Inc. ("Brex"), and one with

Interactive Brokers LLC ("Interactive Brokers").

46.     One of Parent's Bank Accounts with First Republic (the "Primary

Upstream Account") is used as the ultimate upstream recipient for all sale proceeds, net

of the costs of goods sold, generated from the sale of inventory using intellectual

property owned by the Domestic Acrux Subsidiaries and Parent.  The Primary

17

Upstream Account contained approximately $64,000 as of the Petition Date. Upon receipt, the Debtors manually move funds from the Primary Upstream Account to Parent's Bank Account with Brex the ("Brex Operating Account"), where it remains prior to being transferred to the final recipient, the third-party payee. The Brex Operating Account processes a substantial majority of all payments made on account of the Debtors' combined operating expenses, including payroll, inventory, marketing and other business costs, and administrative expenses.[4]   The Brex Operating Account contained approximately $1.26 million as of the Petition Date.

47.    Parent maintains a second Bank Account with First Republic (the "Organic Brand Amazon Account") used to receive sales proceeds from Amazon accounts held by Parent, which are then transferred to the Primary Upstream Account, and then to the Brex Operating Account. The Organic Brand Amazon Account contained approximately $3,000 as of the Petition Date.

48.    Parent also holds an account with Interactive Brokers LLC that is used as a savings account to earn interest cash (the "Savings Account"). The Savings Account contained approximately $5.27 million as of the Petition Date. Periodically the Debtors transfer funds from the Savings Account to the Brex Operating Account to pay ordinary course operating expenses.

49.    *Acrux and the Acrux Subsidiaries*. Debtor Acrux has one Bank Account in its name at First Republic (the "Acrux Account"), which held approximately $95,000 as of the Petition Date. Acrux acts as an intermediary account to receive

---

[4]    Some payments are made directly from the Primary Upstream Account, including quarterly payments to Sellers Finance on account of prepetition secured debt obligations. Additionally, some foreign payments are made directly by Benitago Ltd.

transfers from the Acrux Subsidiaries Accounts (as defined below) and then transfer such funds to the Primary Upstream Account.

50.    Each of the Acrux Subsidiaries, in turn, has a separate Bank Account with First Republic (collectively, the "Acrux Subsidiaries Accounts"), which is linked to a separate "Seller Account" at Amazon under the respective Amazon Agreement. As of the Petition Date, the Debtors had approximately $5,000 in cash on hand in the Acrux Subsidiaries Accounts.

51.    Prior to the execution of the Intercompany Agreement (as defined below), substantially all sales proceeds received by the Acrux Subsidiaries (net of the Amazon Fees) were transferred to Acrux's First Republic Account and then transferred to Parent. However, following execution of the Intercompany Agreement, the Parent invoices Acrux and the Acrux Subsidiaries for inventory (on consignment) and services, which Acrux and the Acrux Subsidiaries pay with available cash. As described in greater detail below, the Debtors are proposing to continue these practices under the Intercompany Agreement on a postpetition basis.

52.    *Aludra Ltd.* Debtor Aludra is a United Kingdom corporation and has four (4) Bank Accounts in its name (the "Aludra Accounts"),[5] which are used to process funds related to Amazon Seller Accounts for sales in Europe (the "European Seller Accounts").[6] The Aludra Airwallex Account is used to receive sales proceeds paid in Euros from European Seller Accounts. The three (3) remaining Aludra Accounts are operating accounts with HSBC, one for each type of currency—U.S.

---

[5]    This does not include (1) an Aludra Paypal account that was closed in 2022; and (2) an Aludra Airwallex Account in GBP that was created but never used, and which contains no funds.

[6]    Shortly before the Petition Date, the Debtors transitioned their accounts from FIRE to Airwallex. While the Debtors are still in the process of closing certain of the FIRE accounts, the Debtors have *de minimis* funds, and do not process any payments through, the FIRE accounts.

Dollars, Euros, and Pounds.  Sales proceeds are collected in Aludra's HSBC accounts (sales in Euros are first transferred from the Aludra Airwallex Account to the Aludra HSBC Account).  Funds are retained in the Aludra Accounts for payment of certain expenses, and are occasionally transferred to the Benitago Ltd. Accounts (as defined below) with HSBC.  As of the Petition Date, the Debtors had approximately $5,000 in cash on hand in the Aludra Accounts.

53.     *Benitago Ltd. Bank Accounts*. The Debtors also maintain seven (7) bank accounts in the name of non-Debtor Benitago Ltd., a United Kingdom corporation (the "Benitago Ltd. Accounts") and fully owned-subsidiary of Parent.[7]  Three of the Benitago Ltd. Accounts are with Airwallex and the three accounts are with HSBC—one in each of U.S. Dollars, Euros, and Pound, respectively.  The Benitago Ltd. Accounts primarily relate to the sale of products outside the United States using intellectual property owned by Parent but not by Acrux.  Sales proceeds are received by Benitago Ltd. Airwallex from the Amazon Accounts, and then transferred to Benitago Ltd. HSBC Accounts.  Funds in the Benitago Ltd. HSBC Accounts are used to make outgoing payments to contractors or transferred to the Brex Operating Account or the Interactive Brokers Account.   As of the Petition Date, the Debtors had approximately $734,000 in cash on hand in the Benitago Ltd. Accounts.

54.     In their normal course of operations, the Debtors maintain a corporate credit card program for their employees (the "Corporate Credit Card Program").  Each of the Debtors' twelve employees utilize virtual corporate cards (the "Virtual Cards") issued by Ramp Business Corporation ("Ramp"), and two employees

---

[7]     Shortly before the Petition Date, Benitago Ltd. transitioned many of its accounts from FIRE to Airwallex.  While the Benitago Ltd. is still in the process of closing certain of the FIRE accounts, Benitago Ltd. has *de minimis* funds, and does not process any payments through, the FIRE accounts.

have access to physical corporate credit cards (the "Physical Cards" and, together with the Virtual Cards, the "Ramp Cards").

55.     The Debtors issue numerous Virtual Cards, each one customized to be usable only for a specific vendor and limited by class (either by an individual brand name or the company as a whole), and department. Each Virtual Card belongs to a specific card "owner," and the creation and issuance of such cards must be approved by the Debtors' Chief Executive Officer (the "CEO"), other than cards issued to the CEO which must be approved by the Debtors' internal accounting department. The Debtors' employees use the Physical Cards to incur expenses in the ordinary course of business.[8] The vast majority of the costs incurred to the Ramp Cards are related to same-day advertising campaigns. Each of the Ramp Cards has a set limit that is established at the time the card is issued, and all Ramp Cards are subject to the Debtors' aggregate monthly credit limit of $500,000.

56.     At the conclusion of each month (or periodically earlier than that if the Debtors exceed their credit limit), the Debtors pay Ramp the outstanding amounts on account of the Ramp Cards in full by payment from the Parent's Primary Operating Account. The Debtors incur on average approximately" $350,000 of aggregate expenses through the Ramp Cards each month. As of the Petition Date, the Debtors estimate that there are approximately $330,000 in outstanding amounts accrued and owed on account of the Ramp Cards.

57.     Prepetition, in the ordinary course of business, the Debtors engage in routine business relationships with each other, including payments and transfers

---

[8]     In addition to employees, certain contractors also have access to Virtual Cards.

from one Debtor to another (the "<u>Intercompany Transactions</u>").  The Debtors seek the
authority to continue the Intercompany Transactions in the ordinary course of business.

58.    The following is a description of Intercompany Transactions
between (a) Parent and Acrux / the Acrux Subsidiaries, and (b) Parent and the Non-
Debtor Affiliate.

59.    *Parent and Acrux / the Acrux Subsidiaries*.  The ordinary course
Intercompany Transactions between Parent and the Acrux Subsidiaries are essential to
the Debtors' business.  Parent supplies the Acrux Subsidiaries with inventory (on
consignment), which the Acrux Subsidiaries sell to third parties on Amazon's platform
under the unique brands owned by the Acux Subsidiaries.  In addition, Parent manages
the Amazon operations of all Debtors and pays the ordinary course operating expenses
for all Debtors, such as payroll, managerial and finance functions, and acquisition of
new inventory, among other things.  Prior to July 18, 2023, when Vikram Jindal was
appointed as the special manager (the "<u>Special Manager</u>") of Acrux and the Acrux
Subsidiaries with authority over transactions between Parent and Acrux, all sale
proceeds (net of Amazon costs) of the Acrux Subsidiaries were transferred to Parent.

60.    Following the Special Manager's appointment, on August 23, 2023,
Parent, Acrux and the Acrux Subsidiaries entered into an Interim Sales and Services
Agreement (the "<u>Intercompany Agreement</u>") memorializing the Parent's continued
provision of all administrative, operational, corporate, management, and related
services for Acrux as well as the continued provision of inventory (on consignment)
related to the Acrux and Acrux Subsidiary brands.  Pursuant to the Intercompany
Agreement, the Parent has committed to continue to provide Acrux and the Acrux

Subsidiaries with inventory and services related to the brands owned by Acrux at cost.[9] While historically the Debtors did not allocate expenses between Parent, on the one hand, and Acrux and the Acrux Subsidiaries, on the other hand, in July 2023, the Debtors obtained as part of the July Forbearance Agreement with CoVenture, an allocation analysis and report from Portage Point, that provided for the allocation of inventory and services on a cost basis for the period of January 2023 through June 2023. That allocation report forms the basis for assessing the amounts the Parent charges Acrux and the Acrux Subsidiaries, with the Special Manager's approval, for the inventory and services that Parent provides to Acrux and the Acrux Subsidiaries.

61.    The Debtors intend to continue to perform under the Intercompany Agreement on postpetition basis.  Thus, during these Chapter 11 Cases, Parent will continue to pay all expenses on behalf of itself and all Debtors consistent with the Intercompany Agreement.  Parent reserves its right to argue that its claims against Acrux and the Acrux Subsidiaries for the fair market value of the inventory and services that it provides exceeds the amounts charged under the Intercompany Agreement. However, to the extent that Acrux and the Acrux Subsidiaries do not have sufficient funds to pay any amounts that come due under the Intercompany Agreement, Parent has agreed that it will have an unsecured claim against Acrux and the Acrux Subsidiaries which will be subordinated in right of payment to repayment of the CoVenture Loan Agreement.

---

[9]    Parent believes that providing such inventory and services at cost does not adequately compensate the Parent for all of the costs and risks incurred by Parent in connection with providing such inventory and services.  For example, when Parent sells inventory at cost to Acrux and the Acrux Subsidiaries, repayment of cost of goods sold absent a markup does not appropriately compensate Parent for the costs and risks that inventory does not sell, must be sold at a discount, or is discarded entirely under various circumstances.  As such, Parent reserves the right to assert claims against Acrux and the Acrux Subsidiaries for the fair market value of such inventory and services.

62.    *Parent and the Non-Debtor Affiliate*.  The ordinary course
Intercompany Transactions also involve routine transfers of funds between certain
Debtor Bank Accounts, namely those held by Parent and Aludra, and certain Non-
Debtor Affiliate Bank Accounts.  Aludra and the Non-Debtor Affiliate are both U.K.
companies that control Amazon "Seller Accounts" that sell products in the European
Union and the United Kingdom.  Aludra uses three HSBC Bank Accounts to collect
sales proceeds from foreign sales in Euros, Dollars, and Pounds, and transfers such
funds upstream to one of the Non-Debtor Affiliate's three HSBC Bank Accounts
according to currency.  The Non-Debtor Affiliate uses funds in its HSBC Accounts to
pay contractors, and transfers funds upstream to Parent, either to the Brex Operating
Account or the Interactive Brokers Savings Account.  On occasion, Parent transfers
money down to the Non-Debtor Affiliate to satisfy large payments, such as tax
obligations.

63.    The ordinary course Intercompany Transactions also involve
routine transfers of funds between certain Debtor Bank Accounts, namely those held by
Parent and Aludra, and certain Non-Debtor Affiliate Bank Accounts.  Aludra and the
Non-Debtor Affiliate are both U.K. companies that control Amazon "Seller Accounts"
that sell products in the European Union and the United Kingdom.  Aludra uses three
HSBC Bank Accounts to collect sales proceeds from foreign sales in Euros, Dollars, and
Pounds, and transfers such funds upstream to one of the Non-Debtor Affiliate's three
HSBC Bank Accounts according to currency.  The Non-Debtor Affiliate uses funds in its
HSBC Accounts to pay contractors, and transfers funds upstream to Parent, either to the
Brex Operating Account or the Interactive Brokers Savings Account.  On occasion,
Parent transfers money down to the Non-Debtor Affiliate to satisfy large payments,
such as tax obligations.

64.     If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls could be disrupted to the Debtors' and the estates' detriment.  In addition, a number of critical services, including centralized management services and cash management services, currently provided to Debtor entities on an intercompany basis would be interrupted.

65.     In the ordinary course, the Debtors incur periodic service charges, payment processing fees, and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees"), which are only *de minimis* amounts each month.  Under the First Republic accounts, the Debtors receive a credit from the bank based on the daily average balances in the Debtors' accounts, which the Debtors use to offset account service and maintenance fees (and usually continue carrying credits in excess of the fees charged.  HSBC charges monthly service fees of *de minimis* amounts depending on location.  Airwallex and Brex do not charge any maintenance or service fees.  Any Bank Fees, if applicable, are deducted by the applicable bank automatically on a monthly basis after application of any credits as discussed above.

66.     I understand that certain of our Banks are not authorized depositories as required under the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines").  The Debtors intend to work with the U.S. Trustee regarding bringing the Bank Accounts into compliance with the U.S. Trustee Guidelines or, if an agreement cannot be reached, will seek a waiver of the requirements of section 345 of the Bankruptcy Code.

67.     Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest.  Accordingly, I respectfully submit that the Cash Management Motion should be approved

**H.**   **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; and (II) Granting Related Relief (the "Wages Motion")**

68.    By the Wages Motion, the Debtors are seeking entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) pay compensation for employee wages, salaries, and other accrued compensation, as well as related prepetition deductions from employees' wages and salaries, and independent contractors and similar personnel, (b) continue making contributions to fully insured medical, dental, vision and other employee benefits plans, and (c) pay all costs and expenses incident to the foregoing payments and contributions, including payroll-related taxes and related processing and administration costs.  The Debtors also seek to continue on a postpetition basis the Debtors' various benefit programs for their employees.

69.    As of the Petition Date, the Debtors have twelve employees (the "Employees") and more than approximately 80 independent contractors or temporary employees.  The Debtors' employees and independent contractors are intimately familiar with the Debtors' business, processes, and systems, and the employees and independent contractors possess unique skills, knowledge and relationships with the Debtors' vendors and business partners.  Maintaining the goodwill of the Debtors' employees and independent contractors and ensuring the uninterrupted availability of their services during this period of uncertainty is critical to the Debtors' reorganization.  Additionally, any harm resulting from the Debtors' failure to obtain the relief requested in the Wages Motion would not be limited to the Debtors' estates but would affect the Debtors' employees' ability to meet their own personal obligations.

70.     The Debtors believe that, as of the Petition Date, there may be amounts accrued and owing under or related to Compensation and Benefits Programs (the "Prepetition Employee Obligations"), which the Debtors estimate to be approximately $220,000, including amounts owed to contractors and agencies.  Of this amount, approximately $220,000 will become due and payable during the first 28 days of the Chapter 11 Cases (the "Interim Period").   The various components of the Debtors' employee-related obligations are described in further detail in the Wages Motion.

71.     The Debtors are not seeking to make any payments to employees or independent contractors in excess of the statutory priority cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code and are not seeking authority to pay any pre- or postpetition retention, severance or other bonuses to any insider or non-insider employees.

72.     Accordingly, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Wages Motion should be approved.

**I.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to all Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief (the "Vendor Motion").**

73.     By the Vendor Motion, the Debtors are seeking entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition (i) claims held by foreign vendors (the "Foreign Vendor Claims"), in an amount not to exceed $1,000,000, (ii) claims related to distribution vendors, shippers, and other lien claimants (the "Lien Claims"), in an amount not to exceed $350,000, (iii) and claims of 503(b)(9) claimants (the "503(b)(9) Claims" and, together with the Foreign Vendor Claims and the

Lien Claims, the "Trade Claim" and, the holders of Trade Claims, the "Vendors"), in an amount not to exceed $10,000, and (b) granting related relief.

74.     In the ordinary course, the Debtors incur obligations to numerous suppliers and manufacturers of goods whose assets are located exclusively outside of the United States.  The Debtors rely on these foreign vendors' timely provision of specialized goods and inventory to maintain their ongoing sales.  The suppliers provide a range of goods in various stages of production and packaging.  Orders from suppliers generally take several weeks to travel from China to their final destination point at the Amazon warehouses, where they are held by Amazon and then transported by Amazon to customers as orders are placed.  The process of replacing an existing suppliers would likely takes months or longer; beyond identifying the new supplier and agreeing to terms for the purchase and sale of goods, the Debtors would also need to coordinate and make arrangements with new shippers, importers, customs agencies, and other third parties.  A number of these suppliers may also be entitled to priority under section 503(b)(9) of the Bankruptcy Code.

75.     The Debtors also routinely transact with a number of third-party service providers that ship, transport, and store the Debtors' products and may assert various statutory liens against the Debtors and their property.  These parties are responsible for shipping, storing, and facilitating the movement of goods (a) from China to the United States, Southampton (UK), or Germany, and then (b) within the applicable country / region to the Amazon fulfillment center warehouse where it is stored and held until a customer order is placed and fulfilled by Amazon.  In some instances, because Amazon places limits on how much of a particular product can be held at a particular Amazon warehouse, the Debtors will store inventory at various other warehouses.  These other warehouses sometimes provide the transporting service to deliver

inventory from the warehouse to the Amazon fulfillment center.  In some cases, the

Debtors will use Amazon's partner carrier and Amazon will come pick it up from the

warehouse and bring to the fulfillment center

76.     Accordingly, I believe that the relief requested in the Vendor

Motion is in the best interests of the Debtors' estates, creditors, and all other parties in

interest.  Accordingly, I respectfully submit that the Vendor Motion should be

approved.

**J.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Taxes and Fees and (B) Continue Prepetition Surety Bond Program in the Ordinary Course of Business and Pay all Obligations Related Thereto; and (II) Granting Related Relief (the "Taxes Motion").**

77.     By the Taxes Motion, the Debtors request entry of an order to

(a) remit and pay the Taxes and Fees (defined below); (b) continue and renew their

Surety Bond Program in the ordinary course of their business; and (c) grant related

relief.

78.     In the ordinary course of business, the Debtors collect, withhold

and incur various sales, use, income, franchise, foreign, commercial activity, import and

customs and other taxes, duties, fees and other expenses, including tax administration

obligations (collectively, the "Taxes and Fees") to various foreign and domestic, federal,

state and local government entities, service providers or tax administrators (collectively,

the "Taxing Authorities").  Because many of the Taxes and Fees are paid on a periodic

basis (and in arrears), there is often a lag between the time when the Debtors incur an

obligation to pay the Taxes and Fees and the date such Taxes and Fees become due and

payable.  The Debtors estimate that approximately $1,141,500 in Taxes and Fees relating

to the prepetition period are accrued and unpaid as of the Petition Date.

79.      The Debtors believe that failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways including (a) impairing the Debtors' ability to conduct their business in certain jurisdictions; (b) potentially subjecting the Debtors to scrutiny by the Taxing Authorities; (c) potentially subjecting certain of the Debtors' directors and officers to claims of personal liability; and (d) exposing Debtors to penalties, accrual of interest, or both, for unpaid taxes -- all of which would detract the Debtors from their reorganization efforts and negatively impact the Debtors' business or the reorganization process.  Payment of outstanding tax obligations owed by Debtor Aludra, a U.K. entity, will also enable to Debtors to receive a tax refund far in excess of the prepetition tax obligation.

80.      Additionally, in the ordinary course of the Debtors business, certain statutes, rules and regulations require that the Debtors provide surety bonds to certain third parties, often to governmental unites or other public agencies, to secure the Debtors' payment or performance of certain obligations (the "Surety Bond Program"). These obligations include, among other things, customs liabilities.  The Surety Bond Program secures essential obligations which are necessary for the Debtors' global operations.  In particular, the Surety Bond Program allows for the Debtors to import products across U.S. borders.  As such, failing to provide, maintain, or timely replace their surety bonds will prevent the Debtors from undertaking essential functions related to their operations.

81.      Accordingly, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Taxes Motion should be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

30

Executed on: August 31, 2023
New York, New York


By:   _/s/ Thomas Studebaker_
Name:   Thomas Studebaker
Title:      Chief Restructuring Officer, Benitago
Inc. and its debtor subsidiaries.